

R. H. Whilden and J. P. Adoue, both of Houston, for appellant.

O. F. Wencker, J. W. Hassell, J. W. Hassell, Jr., Herbert W. Whisenant, and S. W. Marshall, all of Dallas, for appellees.

LOONEY, Justice.

Appellant, Shell Petroleum Corporation, appealed from an adverse judgment, and, although the pleadings are voluminous and complex, the material facts are practically undisputed, and, in our opinion, show that the trial court rendered the only judgment that properly could have been rendered. For the sake of brevity, the corporations involved will be referred to as follows: The Royal Petroleum Corporation, as The Royal; the Shell Petroleum Corporation, as The Shell; The Magnolia Petroleum Corporation, as The Magnolia; the Lion Oil Refining Company, as The Lion, and the Republic National Bank & Trust Company, as The Bank.

The material facts are these: on July 19, 1932, Mrs. G. E. Caster, owner of an oil lease on a 41-acre tract of land in Rusk County, Tex., joined by her husband, B. B. Caster, conveyed the lease, by deed properly signed and acknowledged, to The Royal in consideration of $1,500 cash "and $25,000.00 payable out of $\frac{1}{4}$ of $\frac{7}{8}$ of all the oil and/or gas produced, saved and marketed from said 41-acre tract above described from wells producing oil and/or gas by natural flow, * * * now drilled or to be hereafter drilled thereon; the title to said proportionate part of the oil subjected to the payment of $25,000.00 shall pass to grantors upon delivery by grantee to the pipe line company to which said wells may be connected and until said sum of $25,000.00 has been received by grantors, such pipe line company or purchaser is authorized to pay to the grantors the purchase price of $\frac{1}{4}$ of $\frac{7}{8}$ of the oil from each well situated on said above described 41-acre tract * * *, said payments to be made as, if and when the oil is produced, saved and marketed."

It will be observed that title to the share of the oil (one-fourth of seven-eighths) subjected to the payment of the unpaid purchase money did not pass to the Casters (or assigns) until produced and delivered to the pipe line to which the well or wells might be connected. During the time involved The Royal was in charge of the lease, the oil wells, the oil produced, and its sale and delivery to the several pipe line companies purchasing same (hereinafter named). After the conveyance by the Casters to The Royal (July 19, 1932), and prior to February 1, 1935, purchasers of the oil produced paid the Casters and assigns, from the share of the oil subjected thereto,

the total sum of $24,899.88, lacking only $100.12 of being payment in full of the $25,000 mentioned in the deed from the Casters to The Royal; that is to say, The Magnolia, the first purchaser of oil, paid a total of $8,427.05; The Lion, succeeding The Magnolia as purchaser, paid the total sum of $6,065.14; and The Shell, succeeding The Lion as purchaser (on May 21, 1934), paid $10,407.69, and at the time of the trial held undistributed the sum of $100.12; thus showing that a sufficient quantity of oil had been produced and sold to fully satisfy the $25,000 item of purchase money, and, in addition, The Shell held $3,000 which evidently belonged to The Royal; these items—to wit, $100.12 and $3,000—were tendered in court by The Shell.

The record further discloses that Mrs. Caster, joined by her husband, executed and acknowledged five separate transfers, each for a partial interest in the unpaid consideration of $25,000, to Allen K. Puckett, aggregating the sum of $8,550, as follows: (1) On February 16, 1933, a $1,000 interest payable $50 on the 12th day of each month, beginning March 12, 1933; (2) on March 17, 1933, a $1,000 interest payable $50 per month, beginning April 12, 1933; (3) on April 25, 1933, a $2,550 interest, payable $75 per month, beginning June 12, 1933; (4) on October 3, 1933, an interest of $1,000, payable $50 per month beginning November 12, 1933; and (5) on February 21, 1934, an interest of $3,000, payable $125 per month, beginning March 15, 1934; aggregating $8,550, the monthly payments aggregating $350.

The terms of these transfers are identical, the material parts read:

"The undersigned (the Casters) having transferred, as indicated below, oil productions of wells numbers one and up on the (referring to the land in question), you (the purchaser) are hereby authorized, beginning at (indicating the date) and until further notice to give credit for oil received on account of said interest as transferred, as follows:

Credit to     Transferred interest     Address
Allen K.      Amount payable per       Give box
Puckett       month                    number and
                                       street address

"Due on the 12th day of each month out of Mrs. G. E. Caster's and B. B. Caster's interest. * * * The above payments shall continue (stating the number of consecutive months), or until the total sum of (stating the amount) has been paid Allen K. Puckett. * * * " These instruments, that is, the conveyance of the lease to The Royal and the several transfers or assignments to Allen K. Puckett, were filed and recorded in the office of the county clerk of Rusk county. On March 29, 1934, prior to the time The Shell became purchaser of the oil, Allen K. Puckett assigned to The Bank, as collateral security for debt, the interests assigned to him by the several transfers heretofore set out; this assignment was also acknowledged and, on March 30, 1934 was recorded in the office of the county clerk of Rusk county, Tex.

On June 9, 1934, after The Shell became purchaser of oil runs, but before the distribution of proceeds, the parties at interest, including The Bank, representing the Puckett interests as assignee, executed and delivered to The Shell a document called "Division Order," showing the interests of the respective parties, among others, showing that The Bank (Puckett's assignee) was entitled to be paid, from one-fourth of seven-eighths of the oil produced from the wells and delivered to the purchaser, the sum of $350 per month; the instrument reciting that: "Shell Petroleum Corporation is hereby authorized until further written notice, to receive the oil from said wells for purchase from said parties severally in the proportions named, subject to the following conditions: First, the oil run in pursuance of this Division Order shall become the property of The Shell Petroleum Corporation upon delivery thereof to any pipe line designated by it. Second, the oil received in pursuance of this Division Order shall be paid for to the party or parties entitled thereto according to the division of interests shown above, at the price for each day's receipts posted on that day by Shell Petroleum Corporation, for the same kind and quality of oil in the field in which it is received. Settlement therefor shall be made on or before the 12th day of each calendar month for oil run during the preceding month. These payments are to be made in checks of the Shell Petroleum Corporation to be delivered or mailed to the parties thereto entitled, at the address above given. * * * Fourth, each undersigned hereby warrants and guarantees the title to the oil credited to such undersigned owner according to the division of interest hereinabove indicated, as

well as all interests hereinafter acquired." The record fails to disclose that any further written notice was given The Shell as to a change of ownership of the Puckett interests, or the amounts to be paid each month, or the method of payment.

As heretofore shown, payments by The Magnolia and The Lion reduced the amount of the $25,000 item of purchase money, leaving unpaid $10,507.81 at the time The Shell became the purchaser, of which amount $5,125 was payable on the Puckett claims held by The Bank, as collateral; that amount being the difference between the aggregate of the five Puckett assignments ($8,550) and the aggregate of payments made by The Magnolia and The Lion. These companies paid to each interested party, including Puckett and The Bank, the full amount due for their respective interests in the oil runs; no contention is here made to the contrary. So, in passing, at this juncture, we hold that the contention of The Shell that The Magnolia and The Lion were necessary parties to the suit, being without merit, is overruled.

Prior to the institution of suit, The Shell had purchased oil in excess of $10,507.81 (the amount unpaid of the $25,000 item at the time it became purchaser), and had paid the interested parties that amount, except $100.12, which it held together with $3,000 in excess of the amount necessary to pay the balance of the purchase money. However, the record discloses that, in the distribution of payments, The Shell paid the Casters $7,707.69, being $2,425, in excess of the amount due them, and paid The Bank on the Puckett transfers only $2,700, being $2,425 less than their share of the proceeds. On this phase of the case the trial judge found that: "Shell Petroleum Corporation, without any authority from Royal Petroleum Company or Allen K. Puckett, paid Mrs. G. E. Caster and B. B. Caster Two Thousand Four Hundred Twenty-Five ($2,425.00) Dollars, which said Puckett and Republic National Bank & Trust Company were entitled to receive, and which said Shell Petroleum Corporation was under the obligation to pay to said Bank and said Puckett." This fact— that is, the overpayment of the Casters and the underpayment of Puckett and The Bank—occasioned this lawsuit, and precipitated the cross-actions by the parties against each other.

Although the pleadings are voluminous, in view of the disposition which will be made of the case, we do not deem it necessary to do more than mention the decisive issues presented. The Royal alleged that, sufficient oil having been produced and sold to pay in full the item of $25,000 purchase money recited in the deed to it by the Casters, it was entitled to releases, and had demanded of interested parties receiving payments the execution of suitable releases, freeing the leasehold from the implied lien; alleged the refusal of the parties to execute same; also alleged in detail facts, not necessary to be repeated, praying that, on final hearing, the court adjudicate that the parties (the Casters, The Bank, Puckett, and The Shell) owned no further interest in the leasehold, or in the oil produced therefrom; and that the clouds cast upon the title, by reason of their previously .existing claims, be removed, and that plaintiff have judgment against The Shell for the value of the oil produced in excess of the amount necessary to satisfy the said $25,000 indebtedness.

Puckett answered the main suit and filed a lengthy cross-action against The Royal, the Casters, The Bank, and The Shell, alleging in detail the material facts involved, showing that, although The Shell had purchased a sufficient quantity of oil from the lease to pay his claim, it had failed to do so, lacking $2,425 of paying the full amount due, but instead paid the same to the Casters, for which amount Puckett prayed judgment against all the parties named in his cross-action. However, the only judgment in his favor at all justified by the evidence was the one the court rendered— that is, against the Casters and The Shell.

The interests of The Bank (assignee) and Puckett are not antagonistic, although filing cross-actions against each other, on submission of the case here, The Bank adopted as its own the brief filed herein by Puckett.

The Shell pleaded at great length, contending in effect that it had paid the proceeds of all oil purchased in strict accordance with the terms and provisions of the division and transfer orders, and that payments as made fully discharged it from all liability to Puckett. Also filed a cross-action against the Casters and The Royal, praying in the alternative that if judgment should be rendered against it in favor of Puckett, that judgment be rendered in its favor over against said cross-defendants for the amount of the judgment so ren-

dered, etc. The plea over against the Casters prayed for the only relief to which The Shell was entitled, and the court granted that. The record fails to disclose that the Casters made any appearance, either in the court below or in this court.

The court filed comprehensive findings embracing the facts stated herein, and rendered judgment in favor of Puckett and The Bank (assignee) against The Shell and the Casters, jointly and severally, for the sum of $2,425; providing that payment of the judgment by either, or any part thereof, shall, as to such defendants, be a discharge to the extent of such payment; also rendered judgment in favor of The Shell against the Casters, jointly and severally, for a like amount ($2,425), together with costs, providing that execution shall not issue on the judgment in favor of The Shell against the Casters, or either of them, unless and until The Shell shall have paid the judgment against it in favor of Puckett and The Bank, and then only to the extent of the payment made. The court further adjudged that The Royal recover of and from The Shell and all other parties to the suit the sum of $3,000 tendered into court; that title of The Royal to the said leasehold be discharged of the claim for unpaid purchase money, recited in the conveyance by the Casters to The Royal; that clouds on the title of The Royal to the leasehold, by reason of the previously existing claims of parties, be removed; further adjudging that, except as decreed, each and all parties shall be and are denied any relief as against each other.

■ We think it obvious that this is peculiarly a fact case, and that the finding of the court, heretofore quoted to the effect that The Shell, without authority from the parties at interest, paid the Casters $2,425, which Puckett and The Bank were entitled to receive, was the pivotal fact that settled the main controversy, and consequently all subordinate issues presented in cross-actions by the parties against each other. The Shell had both actual and constructive notice of the rights of the parties; constructive notice by reason of the record of the transfers to Puckett and The Bank, showing the total amount payable and the amount of each monthly payment. These documents were brought to the attention of The Shell in the abstract furnished at the time it began purchasing oil. Asked why an abstract was required, an employee of The Shell testified that, "We wanted to know who was entitled to receive payment for the oil runs." Appellant's attorney called attention to pages of the abstract showing the conveyance by the Casters to The Royal revealing the purchase-money item of $25,000, payable out of one-fourth of seven-eighths of production. The attorney also called attention to the pages of the abstract, showing the several transfers by the Casters to Puckett, aggregating $8,550, also the assignment by Puckett to The Bank; the attorney stating in this connection that: "Either proof should be furnished that these sums have been paid and releases obtained, or proof should be furnished as to the amount still owing and those sums should be taken into consideration in making the purchases and settlements." Also the division order gave the names of the parties to whom oil payments should be made, reciting in this connection that: "B. B. Caster and G. E. Caster (would be entitled to payments until notified by Royal Petroleum Corporation) less $350 per month to Republic National Bank & Trust Company." In addition to the actual and constructive notice mentioned, The Shell, for nearly a year after it began purchasing the oil runs, made monthly payments to The Bank on the Puckett claims, aggregating $2,700; showing actual knowledge as to the correct distribution of the money, so far as Puckett and The Bank were concerned.

Being of the opinion that the facts fix the liability of The Shell and the Casters to Puckett and The Bank for the amount of the fund diverted—$2,425—and in other respects sustain the judgment of the trial court; therefore the same is in all respects affirmed.

Affirmed.